***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner DeLuca and the briefs and arguments before the Commission. The appealing parties have not shown good grounds to reconsider the evidence, receive further evidence or rehear the parties or their representatives. The Full Commission AFFIRMS with some modifications the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as: *Page 2 
 STIPULATIONS
1. All parties necessary to the determination of this matter are properly before the Commission, the Commission has jurisdiction of this matter, the parties are subject to the North Carolina Workers' Compensation Act, the employee-employer relationship existed between the named employer and the named employee, and defendant is self-insured.
2. All parties are correctly designated.
3. The date of the injury is August 27, 2005.
4. The average weekly wage of plaintiff as shown by the Form 22 is $449.55.
5. The parties stipulated into evidence Stipulated Exhibit 1 — the Pre-Trial Agreement; Stipulated Exhibit 2 — plaintiff's personnel file, answers to plaintiff's interrogatories, itemized medical bills, medical records, Industrial Commission forms, and Employment Health Clinic reports; and defendant's Exhibits 1 thru 12.
6. The issues before the Full Commission are whether plaintiff sustained a compensable injury on August 27, 2005 and, if so, was plaintiff disabled as a result of the compensable injury.
 ***********
Based upon all of the competent evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was born on November 17, 1945. She completed the seventh grade. Prior to working for defendant-employer, plaintiff worked as a department manager for the stationary department at a Wal-Mart, in two certified nursing assistant positions, as a day *Page 3 
manager at a bowling alley, and as a line leader doing assembly work at Tyco. Plaintiff is approximately five feet, four inches tall and weighs about 135 pounds.
2. Plaintiff worked for defendant-hospital as a certified nursing assistant II ("CNA II") on the 25-bed oncology unit known as 11 North. Plaintiff began working for defendant on July 12, 2004. Plaintiff worked three 12-hour shifts per week, for a total of 36 hours a week.
3. Defendant has an injury reporting policy requiring employees injured at work to report the injury and to seek medical treatment immediately.
4. On August 27, 2005 plaintiff was working on 11 North with Sara Kearns, the floor nurse. Also present was the unit secretary, Monica Stoots. On this date plaintiff was attempting to assist a patient by the name of Ms. Mack who weighed approximately 368 pounds. Ms. Mack was on a KinAir bed. Plaintiff was paged to put Ms. Mack on a bed pan. The patient was on her left side and plaintiff was standing between the rails of the KinAir bed attempting to steady Ms. Mack with her left arm while holding the bed pan with her right arm. While plaintiff was attempting to hold the patient, Ms. Mack began to roll back towards plaintiff. Plaintiff attempted to stop the roll of the patient. Because of the patient's large size and the fact that plaintiff was on her toes, due to the height of the KinAir bed, the weight of the patient hit plaintiff and threw plaintiff backwards in a twisting motion onto her right leg and also caused her to hit her right arm against the bedside table.
5. Although conflicting evidence was offered, the Full Commission finds that plaintiff immediately went to the floor nurse and informed Ms. Kearns that Ms. Mack had rolled backward onto her and that plaintiff was injured. Plaintiff took off several minutes to get herself together and then returned to the floor and continued to work the rest of the shift. At that time she did not fill out an incident report. *Page 4 
6. Plaintiff continued to work, although she had increased symptoms and her back pain became progressively worse. She further began taking ibuprofen and using heat on her back so that she could continue working. Plaintiff also received some assistance when she was doing harder tasks at work.
7. On September 20, 2005, plaintiff went to Employee Health Services. At that time she was seen by Mary Hales, R.N., and the medical notes indicated that plaintiff had a hard knot on the right side of her back in the upper gluteal area.
8. On September 21, 2005, plaintiff saw Wayne VonSeggen, P.A., who diagnosed right sacroiliac joint capsule inflammation and right hip adductor muscle strain. An occurrence report was filled out by Mr. VonSeggen which described the incident of August 27, 2005. Mr. VonSeggen instructed plaintiff to take ibuprofen and a muscle relaxer, to put ice on the sore areas, and to return if her condition did not improve. Mr. VonSeggen released plaintiff back to work without restrictions. Plaintiff did not return to Mr. VonSeggen for further treatment.
9. Defendant-employer filled out a Form 19 on September 21, 2005. The cause and nature of the injury shown on the form is consistent with the information that was provided to Employee Health by plaintiff.
10. Plaintiff last worked on 11 North on October 20, 2005. Following a vacation, she took a leave of absence from her employment with defendant under the Family Medical Leave Act beginning October 31, 2005.
11. At the same time plaintiff worked for defendant, plaintiff did part-time cleaning for the law offices of Harry Boles in Kernersville, North Carolina. She stopped working in that capacity during November 2005. *Page 5 
12. Plaintiff has not returned to work at defendant or attempted to find any other employment since November 2005.
13. Central Triad Imaging Center did an MRI scan of plaintiff on October 26, 2005. The MRI showed only the normal effects of the aging process on plaintiff's spine: bulging disks, degenerative changes consistent with bulging disks and arthritis, and annular tears.
14. Plaintiff's primary care medical provider was Kernersville Family Practice, which had been providing medical treatment to her since 1998. There is no indication in the records of this provider that she had any prior back problems before August 27, 2005.
15. Andy Secrest, P.A. at Kernersville Family Practice, treated plaintiff on November 7, 2005, November 11, 2005, and November 17, 2005, and noted that plaintiff showed a consistent pattern of ongoing back pain. There were also indications that plaintiff was having some urinary tract difficulties, including the potential of a urinary tract infection, but this was obviously not related to plaintiff's injury on the job. Mr. Secrest noted that plaintiff had possible chronic pain syndrome and referred plaintiff to Dr. Thomas A. Sweasey for a neurosurgical evaluation. Mr. Secrest also referred plaintiff to physical therapy for her soft tissue and muscular injury.
16. On November 17, 2005, Mr. Secrest released plaintiff to return to work with restrictions which included no lifting, bending or stooping. He later opined that plaintiff was not capable of returning to work as a CNA II with those restrictions.
17. Dr. Thomas A. Sweasey, a neurosurgeon, conferred with plaintiff on a referral from Kernersville Family Practice for the purpose of a surgical evaluation on November 9, 2005 and November 16, 2005. Dr. Sweasey noted that the pain in plaintiff's lower back was her biggest complaint and that she had progressive back pain since the date of her on the job injury. *Page 6 
Dr. Sweasey diagnosed plaintiff as having low back and groin pain with no nerve compression and urinary complaints. Dr. Sweasey found nothing wrong with plaintiff neurologically. He released plaintiff to work without restrictions. He further indicated that she should continue conservative treatment which could include physical therapy and a pain specialist.
18. Plaintiff went to the North Carolina Baptist Hospital Emergency Department on November 18, 2005. Plaintiff sought treatment for right flank pain beginning that day, a history of low back pain, and symptoms related to loss of bladder control. The Emergency Department diagnosed plaintiff as having a urinary tract infection and released her to work without restrictions. In his deposition, ER physician Dr. David Manthey stated that plaintiff had chronic low back pain, but that this condition was not the reason for her visit and was not treated. Dr. Manthey also testified that plaintiff received a full duty release effective November 19, 2005.
19. Urologist Dr. John Davis, who was treating plaintiff for ailments unrelated to the alleged incident, wrote plaintiff out of work, in a note dated December 1, 2005, for an undefined amount of time. However, plaintiff has not returned to Dr. Davis for him to reevaluate this status.
20. X-rays taken by Dr. Paul Brown, orthopedic surgeon, on January 9, 2006 revealed only mild degenerative changes in plaintiff's back. In his deposition, Dr. Brown testified that plaintiff may have a sacral plexus injury. He stated that the incident of August 27, 2005, could have caused this condition. Dr. Brown did not think that plaintiff could do CNA work but did think plaintiff could do more sedentary work.
21. Plaintiff then sought treatment from Dr. Stuart Meloy at his clinic from January 2006 until December 2006. Since her injury of August 27, 2005, plaintiff has seen only Dr. Meloy on a regular basis. Dr. Meloy's medical records indicate that the problems with plaintiff's *Page 7 
right lower back and right hip have persisted from the time of that injury. He diagnosed plaintiff with lumbar facet syndrome and termed it "post traumatic" because the condition stemmed from her fall. He further rendered the opinion that her complaints throughout her treatment and care were consistent with the mechanism of the injury described by plaintiff.
22. In dealing with plaintiff's medical condition, Dr. Meloy prescribed facet and sacroiliac injections, radiofrequency ablation, and the use of various medications including Hydrocodone, a Duragesic patch, Vicodin and Tramadol. Further, Dr. Meloy opined that plaintiff has a reactive depression and for that purpose prescribed Cymbalta, Ambien for sleep and also Effexor. From plaintiff's first visit to Dr. Meloy on January 5, 2006 until December 7, 2006, plaintiff was described as having post-traumatic lumbar facet syndrome and chronic regional paraspinous muscle spasm. At the time that plaintiff last saw Dr. Meloy her pain medications were increased.
23. After the December 7, 2006 visit plaintiff was unable to financially afford to return to Dr. Meloy, although she was still under his care, because she did not have any group health insurance after that date. Dr. Meloy stated that he did not know when plaintiff would reach maximum medical improvement but opined that it could take several months if not a year or longer to conclude her treatment.
24. Plaintiff has not received any medical treatment since December 7, 2006, including ongoing prescription medications.
25. The Full Commission finds that plaintiff did sustain an injury by accident to her back on August 27, 2005. Based on the credible testimony of Dr. Meloy, the Full Commission finds that plaintiff sustained lumbar facet syndrome and chronic paraspinous muscle spasms that were causally related to the injury by accident of August 27, 2005. *Page 8 
26. The greater weight of the evidence fails to show that plaintiff was incapable of working between December 2005 and the present. The evidence establishes that plaintiff could not earn her pre-injury wages as a CNA. However, the evidence does not establish that plaintiff was not able to earn her pre-injury wage at any employment. Plaintiff further presented no credible evidence that she has made reasonable efforts to find employment or that such efforts would be futile.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commissioner makes the following:
 CONCLUSIONS OF LAW
1. On August 27, 2005, plaintiff sustained a compensable injury by accident to her back arising out of and in the course of her employment with defendant. N.C. Gen. Stat. § 97-2(6).
2. In order to meet the burden of proving disability, plaintiff must prove that she was incapable of earning pre-injury wages in either the same or in any other employment and that the incapacity to earn pre-injury wages was caused by plaintiff's injury. Hilliard v. ApexCabinet Co., 305 N.C. 593, 290 S.E.2d 682 (1982). An employee may meet the initial burden of production by producing one of the following: (1) medical evidence that she is physically or mentally, as a result of the work-related injury, incapable of work in any employment; (2) evidence that she is capable of some work, but that she has, after a reasonable effort, been unsuccessful in her efforts to obtain employment; (3) evidence that she is capable of some work, but that it would be futile because of preexisting conditions, such as age, inexperience, or lack of education, to seek employment; or (4) evidence that she has obtained other employment at wages *Page 9 
less than his pre-injury wages. Demery v. Perdue Farms, Inc.,143 N.C. App. 259, 545 S.E.2d 485 (2001); Russell v. Lowes ProductDistribution, 108 N.C. App. 762, 425 S.E.2d 454 (1993) (citations omitted). When a plaintiff meets her burden of showing disability, the burden then shifts to defendants to produce evidence that suitable jobs are available for the employee and that the employee is capable of obtaining a suitable job, taking into account both physical and vocational limitations. Demery v. Perdue Farms, Inc., supra.
3. In this case plaintiff has not shown a loss of wage earning capacity as a result of her injury by accident or that such loss is attributable to an injury by accident. Plaintiff has not shown that she was unable to obtain employment after a reasonable effort or that it was futile for her to seek employment because of other factors. She was capable of some work and no doctor took her out of work. N.C. Gen. Stat. § 97-29; Russell v. Lowes Product Distribution, supra.
4. Plaintiff is entitled to payment by defendant of all medical treatment related to her compensable injury and reasonably required to effect a cure, give relief or tend to lessen plaintiff's period of disability. N.C. Gen. Stat. § 97-25.
 ***********
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Plaintiff's claim for temporary total disability benefits must be and the same is hereby DENIED.
2. Defendant shall provide compensation for medical treatment incurred or to be incurred by plaintiff as a result of the compensable injury by accident. *Page 10 
3. Defendant shall pay the costs. Costs shall include expert witness fees of $550.00 to Dr. Brown and $525.00 to Dr. Sweasey, if not already paid pursuant to previous orders.
This 7th day of August, 2008.
 S/___________________
 LAURA KRANIFELD MAVRETIC
 COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/___________________ DIANNE C. SELLERS COMMISSIONER *Page 1